IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA CICHOWICZ, | ) | |
| | ) | Civil Action No. 11-1585 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Cynthia Reed Eddy |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | Electronic Filing |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Barbara Cichowicz ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 8, 10). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI on June 12, 2009, claiming a disability onset date of January 1, 2008. (R. at 88 – 90)[1]. Her claimed inability to work full-time allegedly stemmed from a number of mental impairments including borderline personality disorder, bipolar disorder, depression, and anxiety. (R. at 103). Plaintiff was initially denied benefits on October 14, 2009. (R. at 44 – 47). A hearing was scheduled for May 13, 2010, and Plaintiff appeared to testify, represented by counsel. (R. at 27 – 41). A vocational expert also testified. (R. at 27 – 41). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on May 14, 2010. (R. at 9 – 25). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on October 11, 2011, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 4).

Plaintiff filed her Complaint in this court on December 27, 2011. (ECF No. 3). Defendant filed his Answer on March 23, 2012. (ECF No. 5). Cross motions for summary judgment followed. (ECF Nos. 8, 10).

## III. STATEMENT OF THE CASE[2]

### A. General Background

Plaintiff was born on February 27, 1970, and was forty years of age[3] at the time of her administrative hearing. (R. at 88). She lived in the home of her brother, with her brother's family. (R. at 32). Plaintiff graduated high school, but received no post-secondary education or

---

[1]  Citations to ECF Nos. 6 – 6-21, the Record, *hereinafter*, "R. at __".

[2]  In her Motion, Plaintiff limits her argument to errors committed by the ALJ when determining what disabling limitations were attributable to her mental state. (ECF No. 9 at 3 n. 1). The court, therefore, will limit its discussion of the record to those facts relevant to Plaintiff's mental state, only.

[3]  Plaintiff is defined as a, "Younger Person," at all times relevant to this determination. 20 C.F.R. §§ 404.1563, 416.963.

vocational training. (R. at 30). Her work history included employment as a dishwasher/cook. (R. at 18, 159; ECF No. 9 at 3). She was last employed in January 2009 as a stock clerk at a local Gabriel Brother's store. (R. at 30). She voluntarily quit that job after approximately one-and-one-half months. (R. at 30). Plaintiff had an established history of substance abuse.

A typical day for Plaintiff included watching television, walking, and occasionally shopping. (R. at 116, 119 – 20). She sometimes walked her elderly neighbor's dog. (R. at 117). Plaintiff described being tired and unable to concentrate. (R. at 117, 121). She indicated that her sleep was disturbed and that she was working with her doctors to resolve this issue. (R. at 117). Plaintiff had no difficulties with self-care, except when in a depressed mood. (R. at 117). Plaintiff performed a minimal amount of housework, and cooked only simple meals. (R. at 118). She did not drive and had no license, but was capable of walking, riding a bicycle, and using public transportation. (R. at 119). Plaintiff did not have many hobbies, and did not socialize often due to a distrust of others. (R. at 120 – 21). Plaintiff claimed that she did not handle stress well, and had difficulty getting along with other people, including family members and authority figures. (R. at 121 – 22).

### B. Treatment History

Koushik Mukherjee, M.D. completed a psychiatric evaluation of Plaintiff on October 20, 2008, at Mercy Behavioral Health ("Mercy"). (R. at 229 – 31). Dr. Mukherjee noted ongoing struggles with sobriety and mood. (R. at 229 – 31). Plaintiff complained of depression, severe mood changes, racing thoughts, irritability, impulsivity, sleeplessness, and inability to maintain concentration. (R. at 229 – 31). She reported that her medications were not helpful. (R. at 229 – 31). She had no thoughts of hurting herself, but was "fearing her own thoughts." (R. at 229 – 31). Plaintiff reported suffering physical, emotional, and sexual abuse as a child. (R. at 229 –

31). Substance abuse began at an early age. (R. at 229 – 31). Plaintiff had a long history of legal troubles involving probation and incarceration. (R. at 229 – 31). Plaintiff reported being hospitalized for psychiatric treatment at Mercy in 2007. (R. at 229 – 31). She had difficulty keeping jobs, and was unemployed at that time. (R. at 229 – 31).

Dr. Mukherjee observed that Plaintiff made good eye contact and was cooperative throughout the evaluation. (R. at 229 – 31). Her speech was slightly pressured and her mood was "up and down." (R. at 229 – 31). She showed significant intensity and irritability. (R. at 229 – 31). She had difficulty with attention and concentration. (R. at 229 – 31). Her insight, judgment, and impulse control were all fair. (R. at 229 – 31). Plaintiff's prognosis was guarded. (R. at 229 – 31). Dr. Mukherjee diagnosed Plaintiff with cocaine dependence and alcohol dependence. (R. at 229 – 31). Plaintiff received a global assessment of functioning[4] ("GAF") score of 40, although her highest over the previous year was 45. (R. at 229 – 31). Plaintiff was recommended for medication management and continued therapy to improve her mental health and maintain her sobriety. (R. at 229 – 31).

---

[4] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

The record shows that Plaintiff had a significant ongoing treatment history with Mercy following Dr. Mukherjee's evaluation. This included stints in residential treatment programs in 2009. Both inside and outside these residential programs, Plaintiff engaged in individual and group therapy to address substance abuse issues and her mental health. Among the many records in Plaintiff's medical file are individual and group therapy progress notes spanning May 2009 through March 2010. (R. at 639 – 709, 747 – 59).

In her initial individual progress notes, Plaintiff's GAF scores typically fluctuated in the 40's. (R. at 639 – 709, 747 – 59). Plaintiff was noted to be polite and cooperative. (R. at 639 – 709, 747 – 59). Group progress notes also generally provided GAF scores within the 40's. (R. at 639 – 709, 747 – 59). Plaintiff's participation in therapy increased slowly over time. (R. at 639 – 709, 747 – 59). She claimed to maintain complete abstinence from substance use, but was not as engaged in rehabilitation efforts as recommended. (R. at 639 – 709, 747 – 59). Plaintiff did relapse in July 2009. (R. at 639 – 709, 747 – 59). Following that time, however, Plaintiff began to improve in her ability to cope with high-risk situations involving substance use. (R. at 639 – 709). She became more active in group sessions. (R. at 639 – 709, 747 – 59). She was still hesitant to engage in rehabilitation programs like Alcoholics/Narcotics Anonymous ("AA/NA"). (R. at 639 – 709, 747 – 59).

In October 2009, Plaintiff had become hostile toward another group member. After being pulled aside by the therapist, Plaintiff expressed frustration about her inability to find work. (R. at 639 – 709, 747 – 59). The therapist provided a list of employment agencies, and asked Plaintiff to update him with her progress. (R. at 639 – 709, 747 – 59). Following that time, Plaintiff's positive interaction in group therapy continued. (R. at 639 – 709, 747 – 59).

Plaintiff reported beginning AA/NA meetings. (R. at 639 – 709, 747 – 59). Plaintiff relapsed into substance use again in November 2009. (R. at 639 – 709, 747 – 59).

Plaintiff would still exhibit occasional, slight aggression/hostility in group. (R. at 639 – 709, 747 – 59). Generally, however, she was a positive contributor to discussion. (R. at 639 – 709, 747 – 59). Plaintiff admitted that her anger had become a coping mechanism, and that she needed to work on controlling her emotions. (R. at 639 – 709, 747 – 59). By February 2010, Plaintiff's GAF scores hit 50, and remained there until the end of her progress notes. (R. at 639 – 709, 747 – 59).

Plaintiff also had an actively updated treatment plan at Mercy. (R. at 361 – 97). The earliest of these plans – from May 2009 – indicated that Plaintiff was in need of group therapy several times per week, and medication management. (R. at 361 – 97). Other needs included stable housing and avoidance of situations creating serious potential for relapse. (R. at 361 – 97). Plaintiff was diagnosed with polysubstance abuse, bipolar disorder, and posttraumatic stress disorder. (R. at 361 – 97). She had a GAF score of 45. (R. at 361 – 97). Plaintiff's thought processes were indicated as being self-destructive and uncontrollable. (R. at 361 – 97). She had a history of suicidal ideation; her last attempted suicide was in 2000. (R. at 361 – 97).

This and subsequent treatment plans indicated that Plaintiff had experienced difficulty with employment, suicidal thoughts, social situations, and getting along with other people, including her family. (R. at 361 – 97). Her diagnoses and GAF scores remained the same. (R. at 361 – 97). Although she had abstained from substance use in May 2009, she relapsed in September and November 2009. (R. at 361 – 97). She did eventually begin to engage in AA/NA treatment programs in addition to therapy programs through Mercy. (R. at 361 – 97).

T. David Newman, Ph.D. performed a clinical psychological disability evaluation of Plaintiff on September 29, 2009, on behalf of the Bureau of Disability Determination. (R. at 158 – 62). Plaintiff explained to Dr. Newman that she could not work as a result of terrible anxiety that caused her mind to race to the point that she could not think clearly. (R. at 158 – 62). Plaintiff reported psychiatric hospitalizations on four occasions since 1990, the most recent hospitalization occurring two years prior to her evaluation due to "having a breakdown." (R. at 158 – 62). Plaintiff alleged several attempts at suicide via drug overdose. (R. at 158 – 62). She quit seeing a therapist after a year because of her objection to participating in group therapy. (R. at 158 – 62). She had also stopped seeing a psychiatrist and felt that her medications were not helping her mental state. (R. at 158 – 62). Plaintiff admitted to a history of drug and alcohol abuse, stints in rehabilitation, and difficulty maintaining continued sobriety. (R. at 158 – 62).

Dr. Newman observed that throughout the examination, Plaintiff was cooperative and did not require any sort of assistance. (R. at 158 – 62). Plaintiff was adequately dressed and groomed, she made a fair degree of eye contact, was not anxious, and was aware of her surroundings. (R. at 158 – 62). Plaintiff easily established a rapport with Dr. Newman, had clear, relevant, rational, and coherent speech, and she responded appropriately to questions. (R. at 158 – 62). Her affective expression was limited, though there was no lack of depth. (R. at 158 – 62). She was always appropriate. (R. at 158 – 62). Plaintiff's abstract thinking was intact, her concept formation was intact, her memory was intact, and her general fund of knowledge was nearly adequate. (R. at 158 – 62). Her mood was depressed and dysphoric. (R. at 158 – 62). She also exhibited a disturbance of concentration related to her mood state. (R. at 158 – 62).

Dr. Newman diagnosed alcohol and cocaine dependence in sustained partial remission, and recurrent, severe major depressive disorder. (R. at 158 – 62). Plaintiff was not observed to

7

have impulse control issues, her social judgment was sufficient, and her insight was good. (R. at 158 – 62). Dr. Newman did not anticipate bizarre or outlandish behavior. (R. at 158 – 62). Dr. Newman found Plaintiff to be unable to manage funds on her own behalf due to her history of drug and alcohol abuse. (R. at 158 – 62). She had moderate/marked limitation in understanding, remembering, and carrying out detailed instructions. (R. at 158 – 62). She also had moderate/marked limitation responding appropriately to work pressures in a usual work setting and responding to changes in a routine work setting. (R. at 158 – 62). Plaintiff was otherwise only slightly or moderately limited. (R. at 158 – 62).

A residual functional capacity ("RFC") assessment of Plaintiff was completed by state agency evaluator Kerry Brace, Psy.D. on October 13, 2009. (R. at 163 – 66). Dr. Brace diagnosed Plaintiff with affective disorders and substance addiction disorders. (R. at 163 – 66). Based upon a review of Plaintiff's medical record, Dr. Brace also determined that Plaintiff was markedly limited in terms of understanding, remembering, and carrying out detailed instructions. (R. at 163 – 66). Otherwise, Plaintiff was only moderately to not significantly limited. (R. at 163 – 66). Plaintiff could be expected to complete a normal workday, and could manage employment not involving complicated tasks. (R. at 163 – 66). Dr. Brace generally gave significant weight to the findings of Dr. Newman, but accorded his conclusion that Plaintiff had moderate/marked limitation in responding appropriately to work pressures and changes in the work setting little weight, due to a lack of support in the record. (R. at 163 – 66).

### C. Administrative Hearing

At her hearing, Plaintiff described living in her brother's home, and helping to care for the children in the home when her brother was away. (R. at 32 – 33, 35). Plaintiff also helped to cook meals. (R. at 35). She no longer engaged in hobbies aside from drawing. (R. at 35).

8

However, difficulty with concentration limited the time she spent on activities to approximately half an hour. (R. at 35). Plaintiff claimed that her mind was constantly racing, that she had trouble handling stress, and that her anxiety lead to outbursts of anger. (R. at 35 – 36). Her anger could be directed at anyone. (R. at 36 – 37). Outbursts occurred as much as twice per week, and it took Plaintiff as long as forty five minutes to calm down. (R. at 37).

Plaintiff explained that she quit her latest job primarily as a result of anxiety associated with waiting for/taking the bus to and from work with groups of people. (R. at 30 – 31). Not long before, she had apparently been stabbed while in a crowd at another bus stop. (R. at 30 – 31). In addition to her mental disorders, Plaintiff had a history of alcohol and drug abuse. Plaintiff claimed that she had abstained from all alcohol and drug use since November 2, 2009. (R. at 31 – 32). Plaintiff attended group therapy twice per week at Mercy, and was treated by a psychiatrist once per month. (R. at 33). Plaintiff used several prescription medications to treat her conditions. (R. at 33). The only side-effect experienced was nervousness. (R. at 33). Plaintiff's brother takes her to and from Mercy. (R. at 33 – 34).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would be eligible for a significant number of jobs in existence in the national economy if limited to light exertional work requiring performance of only simple, repetitive tasks not involving dealing with the general public or crowds. (R. at 39). The vocational expert replied that such a person would be capable of working as a "marker" or "ticketer," with 160,000 positions available in the national economy, as a "garment sorter," with 280,000 positions, or as a "hand packager," with 200,000 positions. (R. at 39).

Plaintiff's counsel followed by asking the vocational expert to explain the workplace expectations for full-time employees as it related to being off-task and monthly absences. (R. at 40). The vocational expert responded that for entry-level positions, an employee is expected to be off-task no more than fifteen percent of any given work day. (R. at 40). In terms of absences, an employee could miss no more than one half day per month. (R. at 40).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler*, 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the

Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[5], 1383(c)(3)[6]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the

---

[5] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[6] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

11

evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

## V. DISCUSSION

In his decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of hepatitis C, peripheral neuropathy secondary to a long history of alcohol abuse, left knee osteoarthritis, bipolar disorder, and polysubstance abuse in early remission. (R. at 14). In spite of these impairments, the ALJ determined that Plaintiff was capable of engaging in light exertional work, limited to jobs involving only simple repetitive tasks, and no interaction with the general public or crowds. (R. at 16). Relying upon the testimony of the vocational expert, the ALJ denied Plaintiff benefits because even with such limitations she was eligible for a significant number of jobs in existence in the national economy. (R. at 19 – 20). Plaintiff objects to this unfavorable determination, arguing that the ALJ erred in failing to properly weigh the opinions of Drs. Mukherjee and Newman, by selectively "picking and choosing" evidence to support his conclusions, and in failing to consider certain GAF scores contained within the record. (ECF No. 9 at 6 – 11).

12

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F. 3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F. 2d at 706). In the present case, the ALJ adequately met his responsibilities under the law.

Plaintiff begins by claiming that the ALJ's decision was improper due to its failure to include discussion of Dr. Mukherjee's evaluation. (ECF No. 9 at 7). However, the Court of Appeals for the Third Circuit has held that an ALJ cannot be held responsible for making reference to every relevant treatment note, and that discussion should necessarily be limited to only the most pertinent, probative evidence on record. *Fargnoli v. Massanari*, 247 F. 3d 34, 42 (3d Cir. 2001); *Johnson*, 529 F. 3d at 203 – 04. *See also Phillips v. Barnhart*, 91 Fed. App'x 775, 780 n. 7 (3d Cir. 2004) ("A written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence. Moreover, the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it.") (citations omitted).

While it is true that Dr. Mukherjee reported findings of racing thoughts, mood irregularities, impulsivity, irritability, sleeplessness, and difficulty with concentration, as noted by Defendant, Dr. Mukherjee made no specific limitations findings. Further, while the ALJ did not specifically mention Dr. Mukherjee, he did note that Plaintiff's medical history included

13

findings such as chronic fatigue, racing thoughts, difficulty with concentration, difficulty with anger and controlling emotion, and difficulty with social functioning. (R. at 14 – 18). Plaintiff fails to ascertain what significant effect adding Dr. Mukherjee's name to the list of conditions would have had with respect to the ultimate determination. Objectively, Dr. Mukherjee's findings appear to add nothing new to the decision rationale, which would have impacted the denial of benefits. The ALJ accommodated the conditions at issue by relegating Plaintiff to only simple, repetitive tasks not involving interaction with the general public or crowds. (R. at 16). Plaintiff fails to identify what additional accommodations were necessary based upon the above observations, or how the provided accommodations were insufficient. Based upon the record and the explanation provided by the ALJ, the court does not find that the ALJ committed error requiring remand.

Similarly, with respect to the opinion of Dr. Newman, Plaintiff believes that the ALJ did not accord this opinion proper treatment. (ECF No. 9 at 8). Of greatest significance to Plaintiff was the ALJ's alleged failure to account for "marked" findings of inability to understand, remember, and carry out detailed instructions, and respond appropriately to work pressures and changes in a routine work setting. (ECF No. 9 at 8). The ALJ also allegedly failed to account for Dr. Newman's observations of past hospitalizations and suicide attempts. (ECF No. 9 at 8). In fact, a review of the record shows that Dr. Newman made no "marked" findings in his report. (R. at 158 – 62). As it pertained to Plaintiff's ability to understand, remember, and carry out detailed instructions, and respond appropriately to work pressures and changes in a routine work setting, Dr. Newman indicated that Plaintiff's degree of limitation was between "moderate" and "marked." (R. at 158 – 62). Only Dr. Brace found "marked" limitation, and that was only in the area of understanding, remembering, and carrying out detailed instructions. (R. at 163 – 66).

The ALJ provided for this limitation by relegating Plaintiff to jobs only involving simple, repetitive tasks. (R. at 16). As such, this limitation was fully accommodated.

While the ALJ may have mischaracterized Dr. Newman's findings with regard to responding appropriately to work pressures and changes in a routine work setting, he gave great weight to the entirety of Dr. Brace's evaluation, which rejected Dr. Newman's moderate/marked finding as unsupported by the record evidence. (R. at 18). It stands to reason that the ALJ implicitly rejected Dr. Newman's finding as well. Plaintiff provides no reason why the opinion of Dr. Newman should be favored over that of Dr. Brace, other than that Dr. Brace reviewed only the medical record. However, state agency consultants such as Dr. Brace are highly qualified, and their opinions are often entitled to receive significant consideration when supported. *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (3d Cir. 2011). Further, it is the ALJ's prerogative to choose between conflicting evidence. *Cotter*, 642 F. 2d at 705. To the extent Dr. Newman's and Dr. Brace's conclusions were contradictory, the ALJ favored Dr. Brace due to his thorough explanation, consistency with the medical record as a whole, and explicit finding that with adequate accommodation, Plaintiff could work. (R. at 18). Plaintiff provides no indication of what greater degree of accommodation was required based upon the remainder of the limitations findings made by both Drs. Newman and Brace. The court, therefore, finds the ALJ's rejection of certain of Dr. Newman's findings in favor of Dr. Brace's findings to be supported by substantial evidence.

In terms of Dr. Newman's findings regarding Plaintiff's history of hospitalizations and suicide attempts, the court must first note that the last recorded suicide attempt was in 2000, and Plaintiff fails to explain how this is even relevant to a social security claim filed in 2009. Second, the ALJ did note Plaintiff's history of psychiatric hospitalizations/residential treatment.

(R. at 16). It was counted as an episode of decompensation of extended duration. However, Plaintiff fails to address how this history affects, or adds to, her limitations. As a result, the court finds no error here on the part of the ALJ.

With respect to Dr. Mukherjee's assessment of a GAF score of 40 and multiple GAF scores found within the medical records from Mercy, the court finds that the ALJ's failure to specifically mention these scores was not error requiring remand. In the present case, Plaintiff's treating sources failed to discuss – in any manner – the reasons for assessing the GAF scores found on their reports. *See Coy v. Astrue*, 2009 WL 2043491 at *14 (W.D. Pa. July 8, 2009) (quoting *Chanbunmy v. Astrue*, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008) ("A GAF score, without evidence that it impaired the ability to work, does not establish an impairment")). *See also Gilroy v. Astrue*, 351 Fed. App'x 714, 716 (3d Cir. 2009) (ALJ was not found to have erred when omitting a GAF score where the doctor in question did not make specific limitations findings or otherwise explain the basis for the GAF score).

Presently, the ALJ did not mention any GAF scores explicitly in his determination. Yet, this is not a case where the ALJ merely cherry picked certain GAF scores to bolster his conclusions. No specific limitations findings or explanations accompanied Plaintiff's GAF scores. An ALJ is entitled to overlook evidence that is not probative. *Johnson*, 529 F. 3d at 203 – 04. Probative value, here, is clearly lacking in light of the failure to explain the GAF scores. Therefore, "[t]he Court declines plaintiff's invitation to remand solely so the ALJ can insert the GAF scores into his decision." *Coy*, 2009 WL 2043491 at *14.

## VI.  CONCLUSION

Based upon the foregoing, the court finds that the ALJ properly supported his decision to deny benefits to Plaintiff with substantial evidence. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. Appropriate orders follow.

August 20, 2012

> *s/ Cynthia Reed Eddy*
> Cynthia Reed Eddy
> United States Magistrate Judge

cc/ecf: All counsel of record.